J.J. MICKELSON, Trustee of the bankrupt estate of Ralph Anderson and Myra Anderson, Plaintiff,

v.

Ralph K. ANDERSON, and Myra R. Anderson, Defendants.

In re Ralph K. ANDERSON, and Myra R. Anderson, Debtors.

Adv. No. 4–81–63(O).
Bankruptcy No. 4–80–1964(O).

United States Bankruptcy Court,
D. Minnesota.

March 23, 1982.

Edward W. Bergquist, Minneapolis, Minn., for plaintiff/trustee.

Philip G. Lind, Minneapolis, Minn., for defendants/debtors.

## MEMORANDUM ORDER

KENNETH G. OWENS, Bankruptcy Judge.

Trial in the above adversary proceeding, and hearing on a related motion were held on July 6, 1981. Both attorneys have filed memorandums and the court has been further assisted by amicus briefs filed by William J. Kampf and Paul J. Scheerer, both prominent bankruptcy practitioners.

The trustee's complaint alleges that on the eve of bankruptcy, the debtors intending to defraud their creditors converted certain nonexempt assets into cash which was then used to enhance the value of their homestead property by paying and satisfying a real estate mortgage thereon, and the motion mentioned is that of the debtors in their Chapter 7 case for an order approving and allowing debtors' exemption in full of their homestead which the debtors valued at $85,000.00 in their bankruptcy schedules.

## FACTUAL SETTING

The objective facts are not substantially disputed. As reflected at the hearing and as otherwise appears from the files, the debtor Ralph K. Anderson consulted an attorney on August 27, 1980 about his financial circumstances and the filing of bankruptcy. In the discussion, the debtor informed the attorney about his assets including several admittedly nonexempt assets. The attorney then advised the debtor that conversion of these assets into exempt assets was permissible under the Bankruptcy Code, and use of the proceeds to satisfy the mortgage on his homestead would not affect its exempt status. The attorney in this connection read to the debtor the assertion found in *Historical and Revision Notes* following Sec. 522 in the West Publishing Company pamphlet edition of the Code, the following:

"As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law."

The attorney further advised the debtor that the assets in question might otherwise go to the unsecured creditors.

The debtor in October 1980 sold to third parties, including one item to his father, the assets in question receiving cash in the following amounts:

| | |
|---|---:|
| 1972 Corvette Automobile | $ 4,500.00 |
| 1977 or 1978 Ford truck | 3,500.00 |
| Port Authority Bond | 4,000.00 |
| 50% interest in MinncomCorp | 1,000.00 |
| An unimproved lot | 600.00 |
| Total | $13,600.00 |

The debtor applied this cash fund, other nonexempt cash he had in hand and $1,000.00 borrowed from his father to payment and satisfaction of the existing long term installment mortgage on his homestead in Montevideo, Minnesota and described in Schedule B–4 attached to his petition in bankruptcy, in the sum of $19,-

188.00. Thus all except the $1,000.00 borrowing was from the nonexempt funds.

The debtors filed their voluntary Chapter 7 petition under the Bankruptcy Code on November 24, 1980. In the accompanying statement of affairs, the debtors disclosed the mentioned sales and the payment on the mortgage. In their case, they elected to claim the homestead as exempt under Minnesota law as permitted by 11 U.S.C. Sec. 522(b) which provides an exemption under "State or local law that is applicable on the date of filing of the petition". Minnesota law provides for the exemption of a homestead of limited area but without monetary limitation.

The plaintiff/trustee after his appointment permitted the general claim of exemption to stand under local practice but instituted this adversary proceeding to establish a lien on the homestead to the extent it had been enhanced by the application of nonexempt funds to payment of the mortgage. The debtor Ralph Anderson testified that his purpose in converting the nonexempt to exempt assets was to take full advantage of the exemption allowed to him in bankruptcy and that he did not finally decide to file bankruptcy until after the satisfaction of the mortgage. He admitted in his testimony that his attorney had advised him that his course of conduct might be subject to attack and his understanding that even if not so informed he would have assumed it would be subject to attack by the trustee or creditors.

### THE COMMENT IN WEST

The course of the legislative proposals which eventually became the Bankruptcy Code was unusual with the result that even Committee Reports are often ambiguous and confusing, often contradictory and sometimes in total error when applied to the end legislative product. The comment quoted from West is subject to those frailties. Examination of the legislative proceedings pinpoints the source of the assertion to be in a letter addressed to Congressman Don Edwards by Bankruptcy Judge Phelps of the Central District of California

calling attention to the law apparently prevailing in the Ninth Circuit which permitted such prebankruptcy planning and conversion of non-exempt assets into exempt assets as preliminary to his suggestion that such prebankruptcy planning and conversion of assets should be forfended in the proposed Code. The discussion at the hearing following receipt of the letter was cursory and with no positive indication that such rule of law was universal. Accordingly the West note lacks authority, and the text of the Code does not expressly deal with the question. Accordingly it is appropriate to look elsewhere for guidance. Since the exemption claimed is that afforded by the law of Minnesota, it seems appropriate that the search should be directed to existing Minnesota law.

### DISCUSSION

Minnesota law permits a homestead exemption without limit as to value. Accordingly, if permitted, it could afford a receptacle into which the debtor could pour all of his otherwise nonexempt assets with the effect mentioned by Judge Phelps:

> "here in California the amount of assets that a person contemplating bankruptcy can hide from his creditors with the assistance of a smart attorney is outstanding."

The letter then referred to the numerous possible exemptions under California law but even there the equity in a homestead is apparently limited to $20,000.00.

This court had occasion to consider the applicable Minnesota law in connection with certain cases commenced under the prior Bankruptcy Act and concluded that such transactions were defeasible if accomplished with actual fraudulent intent. In the unreported opinion of February 8, 1979 in the *Matter of Donald J. McGlynn, et al.,* bankruptcy cases No. 4–74 BKY 925, 4–74 BKY 926, and 4–75 BKY 88, this court in a similar situation in addition to other remedies granted judgment constituting a lien on the otherwise exempt homestead. The canvas of Minnesota authorities will not be repeated here but a copy of that memoran-

dum opinion will be appended to this order for the information of counsel and others.

The conclusion in *McGlynn* is reflected in the following short excerpt:

"The ultimate issue is whether McGlynn and Garmaker viewed in the totality of their relationships and activities did in fact intend to defraud their creditors by their actions in enhancing the value of the homestead which they already had, and in concealing other assets in the enhancement of the policies of insurance available to them at the beginning of 1974.

"I conclude that as suggested in *Forsberg* the showing of any fact or circumstance other than the mere conversion which bears on the motive and intent of the bankrupts in the activities leading up to and involving the conversion is relevant to the question, and the issue is simply whether it satisfactorily demonstrates that the bankrupt's intention was not the seeking merely of an exemption but motivated by the fraudulent purpose of removing non-exempt property from the reach of his creditors."

The ultimate question then here as in *McGlynn* is whether the debtor intended merely to obtain an exemption or whether he intended to remove previously non-exempt assets from the reach of creditors. The latter is the "fraudulent" intent mentioned in *McGlynn* there found sufficient to remove the shield of exemption.

In the context of the present case the advice of counsel is essentially irrelevant because counsel merely exhibited by way of the West Note an asserted but erroneous legislative history. And whether or not known to be erroneous the debtor as he conceded in his testimony here assumed his course of conduct would be attacked. Certainly fraud, if blatant, need not necessarily be secret. In the totality of this case, I am satisfied and find that the debtor in the course of conduct resulting in the conversion of nonexempt assets into an enhancement of his admitted homestead property had a fraudulent intent, and should not be permitted to remove the proceeds of the nonexempt assets from the reach of creditors. As in *McGlynn*, there is no warrant in Minnesota law for the loss of the homestead exemption but its shield may be penetrated to permit the relief sought by the plaintiff in this adversary proceeding, that is a judgment in the amount of the converted assets and the fixing of a lien therefore on the homestead real property.

There is no showing that the debtor Myra R. Anderson knowingly participated in the prebankruptcy planning or course of conduct and she should not be the subject of judgment, but being merely a volunteer beneficiary with respect to the enhancement of the homestead, she must suffer the effects of the lien.

ACCORDINGLY, IT IS ORDERED:

1. That judgment shall be entered for the plaintiff and against the defendant Ralph K. Anderson in the sum of $18,188.00, and that the same shall be and constitute a lien and charge on the interest of the said debtor in the following real property:

Outlots One and Two in Plat of Outlots One to Nine (1 to 9) inclusive in the Southwest Quarter of the Southwest Quarter of Section 17, Township 117 North, Range 40 West, Fifth Meridian, Chippewa County, Minnesota, except the following described portions thereof:

1. Beginning at the western most corner of said Outlot One (1) which corner is at the center of Bottom (also known as State) Road in Montevideo; thence Northeasterly along the Northwesterly line of said Outlot One (1) a distance of 75 feet; thence Southeasterly parallel with the Southwesterly line of said Outlot One (1) a distance of 85 feet; thence Southwesterly parallel with the Northwesterly line of said Outlot One (1) a distance of 75 feet; thence Northwesterly along the Southwesterly line of said Outlot One (1) a distance of 85 feet, more or less, to the point of beginning.

2. All of Outlot Two (2) lying Easterly of the following described line: Beginning at a point on the Northwesterly line of said Outlot Two (2) which point is 35

feet Southwesterly of the northern most corner of said Outlot Two (2); thence Southeasterly to a point on the Southeast line of said Outlot Two (2) which point is 110 feet Southwest of the eastern most corner of said Outlot Two.

## APPENDIX
### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA
### FOURTH DIVISION

| In the Matter of: | MEMORANDUM AND ORDER |
|---|---|
| DONALD J. McGLYNN, RICHARD E. GARMAKER, JOANN McGLYNN, | In Bankruptcy Proceeding No. 4–74 BKY 925(O) No. 4–74 BKY 926(O) No. 4–75 BKY 88(O) |
| Bankrupts | |

At Minneapolis, Minnesota, February 8, 1979.

In each of the above bankruptcy cases the trustee, acting pursuant to Bankruptcy Rule 403, made report of the bankrupts' claimed exemptions refusing to set apart to each real estate claimed as exempt homestead, and interests claimed exempt in certain policies of life insurance. Each bankrupt having made objection the resulting controversies were tried, the trustee represented by attorney James L. Baillie and the bankrupts by attorney Mark J. Feinberg.

Following trial, counsel submitted extensive memoranda, the last received on December 20, 1978. The issues accordingly are ready for disposition.

By reason of the nature of the issues involved and because of the properly wide range of testimony and evidence taken during the five day trial the facts require statement to some extent in evidentiary detail.

Based on the testimony and evidence received, the memoranda, and on all of the files and records I find as follows:

### THE FACTS

### A. RELATIONSHIP OF THE PARTIES AND COMMONALITY OF INTEREST IN A CORPORATION

Donald and JoAnn McGlynn are husband and wife. Donald McGlynn (hereafter referred to as McGlynn) and Richard Garmaker (hereafter referred to as Garmaker) were business associates primarily through a common interest in a corporation McGlynn-Garmaker Company (hereafter referred to as Company). The corporation came into existence in 1967 and McGlynn and Garmaker and the wives of each were its sole shareholders. Both McGlynn and Garmaker had extensive prior experience in real estate and the corporation was principally engaged in the financing and construction of apartments and condominiums.

The projects were instituted by the corporation and its principals for ownership by limited partnerships made up of outside investors to whom the corporation sold interests during the course of or following construction. The limited partnership interests were saleable not only because of possible intrinsic worth but also because of tax benefit and were sold to outside investors, mainly professional people. Garmaker was most actively involved in the sale of such tax shelters while McGlynn mainly concerned himself with the management of the properties during and after construction.

Only the limited partnership interests were sold the Company or either McGlynn or Garmaker retaining the required general partnership interest. By reason of the extensive development of such projects, the

individual bankrupts found themselves with substantially identical interests by reason of their common ownership of the corporation and because over the course of time they found it necessary to guarantee its indebtedness and at the time relevant here had in fact guaranteed most of its debt.

McGlynn and Garmaker in 1973 caused the Company to form three wholly owned subsidiaries: M/G Securities, Inc., meant to be a securities broker-dealer, McGlynn-Garmaker Management, Inc., meant to manage the construction projects following completion, and McGlynn-Garmaker Properties, Inc., meant to serve as the corporate general partner in ten new limited partnership ventures planned for that year.

McGlynn and Garmaker had another commonality of interest because they individually and through their interest in the McGlynn-Garmaker Company in 1973 owned approximately fifty-two percent of the stock of McAllister Properties, Inc., (hereafter McAllister), a publicly held corporation engaged in the purchase, sale, and management of real property. McGlynn-Garmaker Company owned seven to eight percent of McAllister and the remaining forty-eight percent of its stock was publicly held by some forty-seven individual shareholders.

Garmaker was president of McAllister and both he and McGlynn had arrangements with it whereby they were paid finders' fees for properties discovered and actually purchased by the Company, and sales commissions when such property was sold. In connection with the acquisition of their share interests in McAllister they had also acquired certain debentures. In addition to their original investment they had over the course of time acquired additional shares and debentures in part in payment for fees and commissions by reason of their purchase and sale arrangements.

## B. THE FINANCES OF THE ENTITIES

## 1. OPERATIONS, SOURCE OF FUNDS, NEED FOR PUBLIC OFFERING

Prior to 1973, McGlynn, Garmaker, and their Company sold the limited partnership interest through restricted offerings. Normally each project was a subject of investment by ten to fifteen individuals. In connection with those sales, the Company notified the State of Minnesota, but there was no federal securities registration.

Each construction project was financed at least in part through a real estate construction mortgage. At the initiation of a project, the Company would also attempt to obtain a commitment for permanent financing so that on completion of the project a long term mortgage could be placed to complete the financing. It was anticipated that start-up costs, operating expenses of the Company itself, and those construction costs not covered by the initial construction mortgage would be met through monies received from the sale of limited partnership interests to investors. In many instances, the perspective investors were not required to contribute cash but submitted promissory notes which the Company then used as collateral in securing its own bank financing. While the projects were in course of construction, the Company had to rely on its own funds and bank lines of credit. Borrowing from banks increased significantly during 1973.

In late 1972, the principals feared the Company would no longer be permitted to use a limited offering exemption in the sale of partnership interests and concluded that in future projects the sales would have to be handled through an S–11 Federal Registration. A registration statement was accordingly prepared for the ten projects that were either commenced or scheduled to commence in calendar year 1973. The registration was supposed to be completed and the offering made effective in May 1973 but it was delayed for two or three months and only came into effect on August 24 of that year. Meanwhile the Company started construction on projects designated as Beaumont, Midvale, Jupiter, Hartley (at Helena, Montana), and a project at St. Cloud, Minnesota. Another, Merrillville, was in advance planning and it appears that

two others Granger and Bountiful were either contemplated or in some stage not clear from the record.

Construction proceeded even though partnership interests could not be sold and in consequence there was a substantial increase in bank financing. The debt in connection with the construction was in addition to that already incurred on previous projects, and the ability of the corporation to meet its obligation on bank debt depended on ability to itself obtain funds by sale of the limited partnership interest to investors and to complete physical construction in such an economical manner as to leave a profit. Accordingly the ability to repay was equally dependent upon ability to qualify the limited partnership investment offerings and ability to sell them when qualified.

## 2. BANK FINANCING

During its early existence, the Company used lines of credit from banks and prior to 1973 its principal bank borrowing was through the First National Bank of Minneapolis. Near the end of 1972, the bank examiner questioned the loan and the First National Bank (hereafter FNB) informed the Company of its unwillingness to continue financing and both McGlynn and Garmaker were individually informed of the bank's position no later than January 1973. At times the secured and unsecured debt of the Company to FNB rose to as much as $1,400,000.00.

At the bank's insistence the indebtedness was reduced by year end 1973 and in the first few weeks of 1974 to $375,000.00 owed by the Company not including outstanding construction loans and existing projects secured by real property mortgage, and the personal indebtedness of Garmaker was in the amount of $70,000.00 and McGlynn is in the amount of $65,000.00.

The Company commenced borrowing from Marquette National Bank of Minneapolis (hereafter Marquette) in October 1972 and in the course of time obtained a series of secured and unsecured loans the last on August 15, 1973. On the latter date Marquette reviewed its position with respect to the loan and terminated the Company's line of credit. Following that the bank through its vice-president Nelson began efforts to formulate a collateral package for the purpose of strengthening the bank's security position. In addition to loans made through the line of credit Marquette was also responsible for and at risk on outstanding letters of credit in favor of the Company. Although no new credit was advanced following August 15, 1973, the ultimate claim of Marquette exceeds $1,200,000.00 principal together with accrued interest.

In late 1972, the Company also started borrowing from the Northwestern National Bank of Minneapolis (hereafter Northwestern). Lines of credit were established at $1,250,000.00 for secured loans and $750,000.00 for unsecured advances. On July 31, 1973, somewhat contemporaneous with the termination of Marquette advances McGlynn and Garmaker requested Northwestern for an additional amount of $1,055,600.00. The bank refused, indicating a tight money situation. Later on October 10, 1973, they made a request for a temporary increase of $500,000.00. The bank was informed that the Company was critically short of capital, mainly because of delay in the registration and public offering with consequent drain on working capital to finance construction. Additional funds were advanced on the Company's commitment to repay the additional $500,000.00, together with the existing $750,000.00 in line of credit borrowing, by December 15, 1973. The parties cited as a source for such repayment sales of the limited partnership interests, refinancing of three existing projects designated as the 730 Building, Phalen Park, and Forest Green, sale of bank stock owned by McGlynn indicated to produce up to $500,000.00 and "sale of imported cattle which should net up to $1,000,000.00 to McGlynn and Garmaker". The latter reference related to stock held by McGlynn and Garmaker personally in a corporation International Cryo-Biological Service, Inc. (hereafter ICBS).

In addition to the temporary financing, Northwestern was told that the Company required a real estate loan on undeveloped land at the intersection of Highway I–494 and County Road 18 financing on that land was to be perfected by October 20 and the proceeds would then be used to make initial repayment on the other unsecured bank loans. While the request came from the Company, the land in question was owned by McAllister.

While the October advances were made, the bank found that by October 31, 1973 the outstanding loans to the Company were indicated to be "criticized loans" in its officer's comment sheets.

There were continuing discussions between McGlynn and Garmaker and Northwestern during late months of 1973 concerning the status of construction projects and that and other sources of repayment for the bank indebtedness. It appears that the proceeds of the sale of Phalen Park Apartments was reinvested in Midvale to break escrow then later returned and used again to break escrow on the Jupiter project. The bank was informed by McGlynn and Garmaker that they were working on financial statements for the Company and new personal financial statements and projections as of September 30, 1973. The information was promised for November 20, 1973 but never provided. The agreed upon repayment of loan was delayed from December 15 to December 31, 1973 when partial repayment only was made and the unsecured balance reduced from the total $1,250,000.00 to $300,000.00.

There were no further advances by Northwestern and with respect to its proof of claim presently filed in the bankruptcy cases in the sum of $1,600,000.00 when reduced by realization on all security will still exceed $1,000,000.00. All three of the bank loans were personally guaranteed by McGlynn, Garmaker, and their wives.

## 3. CONCERNING THE S–11 REGISTRATION

When the S–11 Registration finally became effective, sales of the limited partnerships were slow. Three projects, Merrillville, Hartley, and St. Cloud, were withdrawn from the public offering. Merrillville was subsequently terminated and the funds returned to investors. Helena was sold but St. Cloud produced only $240,000.00. Other projects in the registration, Bountivale, Brownsville, and Garvant partnership, were never commenced.

Only Beaumont, Midvale, and Jupiter remained in the public offering. With respect to Midvale and Jupiter, escrow was broken apparently through the temporary investment of funds from the sale of Phalen Terrace previously mentioned. Beaumont broke escrow but raised only $820,840.00. Sales were not completed later on because the entire S–11 Registration was halted. Substantially all of the funds were used to reduce the outstanding loans at Northwestern.

Because of the tax shelter aspect of the limited partnership interests, they are most successfully offered and sold near the end of the tax year. Consequently only minimal sales of such interest were made after December 31, 1973 mainly to complete commitments made prior to that date, and McGlynn and Garmaker were necessarily aware that there were slim prospects for further sales after that date.

## 4. SITUATION AT YEAR END 1973

By the end of 1973, no further bank financing was available and the loans at all three banks were in a workout situation and in particular Northwestern expected to be completely paid by that time. As of year end, there was no assurance that funds would be available to complete the projects and whether completion of the projects would be within projected costs.

By reason of the lack of accounting with respect to the source and use of funds, the record is unclear as to the availability of funds to complete projects or to handle other costs. James Phelps who was employed to assemble financial information for the Company did inform Marquette in April of 1974 that the Company had been in trou-

ble a year before but that it hadn't become evident then because of the lack of accounting. Nevertheless, I am satisfied that both McGlynn and Garmaker were aware by reason of the tight money situation and the other difficulties existing in the construction field that the Company was in substantial difficulty.

The evidence does indicate to my satisfaction that at least by the middle of January of the following year 1974 the serious situation of the Company, and of their own finances was known to both McGlynn and Garmaker. Their own continued efforts to find some solution to the Company's problems are themselves indicative of their knowledge of its needs.

## C. DEALINGS WITH BANKS IN 1974

### 1. FIRST NATIONAL BANK

The National Bank examiners had indicated in their report that the Company loan, and the individual loans apparently were in a "work-out" situation. McGlynn and Garmaker attended a more than a routine meeting at the FNB Offices on January 4, 1974 where there was discussion of the manner and means of liquidating the outstanding balances. There was another meeting at the bank on January 11, 1974 attended by Garmaker where current personal financial statements of both were delivered to the bank. McGlynn may have been present and certainly discussed the same matters with Garmaker and both were aware of the subsequent letter from the bank's officer dated January 15, 1974 which recapitulated their understanding with respect to source of payment for the individual loans as being the sale by Garmaker of ICBS stock or from the proceeds of a contemplated $300,000.00 land loan to McAllister Properties then being arranged through Iowa Securities Company. The letter reflected an understanding that the land at Highway 494 and 18 was unencumbered and that fifty-two percent of the expected mortgage loan proceeds would be devoted to the repayment of the personal loans.

On the day before, January 14, 1974, the bank officer had advised Garmaker by letter that the Edina Southdale Highrise loan had been classified as substandard by the National Bank examiners and that the entire indebtedness would be required to be paid by February 15, 1974 or the bank would be compelled to resort to the individual guarantees of McGlynn, Garmaker, and their wives.

It had been agreed at the January 11 meeting that the payments would be made fifty percent within ninety days and the balance on or before June 30, 1974.

### 2. MARQUETTE NATIONAL BANK

The Marquette Bank officers were attempting to strengthen the bank's position in late 1973. McGlynn made a status report as to public offerings on January 4, 1974 and indicated that he expected the Company to take care of all of its obligations to that bank by June 30, 1974, as had been the representation made to the First National Bank. He undertook to provide some security within the ten days following and to keep Marquette apprised on a ten day to two week schedule.

Garmaker on January 14, 1974 advised a bank officer of his intention to secure the Company borrowings by notes and second mortgages on various projects including BelAir Forest II, Forest Green, Casper, Beaumont, and Shoreview to a total of $1,055,-871.37. Promissory notes and second mortgages on two of the projects BelAir Forest II, and Forest Green accompanied the letter and others were promised. For some unexplained reason, the notes and mortgages were returned to Garmaker.

### 3. NORTHWESTERN NATIONAL BANK

The Northwestern and other banks had requested further financial information with respect to the Company and its prospects. Garmaker with the aid of Joseph Schuster obtained at meetings to be later described prepared some financial information and later supplied it to the banks.

On January 18, the Company asked Northwestern for a further advance of $375,000.00 but that loan was declined pending receipt of current financial information. The information including cash flow projections resulting from the Schuster meetings was submitted to the bank on January 21, 1974. A part of the bank's understanding in connection with its additional advance of $330,000.00 was that there would be a $1,000,000.00 capital addition to the Company to augment its own earnings. The bank was not satisfied with the cash flow projections for the Company and requested that the working capital line of credit be secured proposing that certain collateral be provided including assignment of contract notes on Midvale, Casper, Shoreview, Helena, St. Cloud, and Bountiful and an assignment of the proceeds of the management contracts involved. In addition the bank requested security interests in all of the partnerships in which the Company was general partner.

The bank requested McGlynn and Garmaker personally to secure their guarantees of the Company obligations with an assignment of their personally held partnership interests. The bank had informed McGlynn and Garmaker that it would expect such collateral to be provided by February 1, 1974. Apparently the bank was unaware at the time that McGlynn and Garmaker had already formed a partnership consisting of their children for the purpose of taking over the management contracts.

On January 29, Northwestern made a further advance of $75,000.00 in reliance upon the cash flow projection it had received and on the understanding the additional substantial capital would be inserted by McGlynn and Garmaker.

### 4. THE SCHUSTER INVOLVEMENT

Apparently in response to the bank's insistence that it be supplied financial information, Garmaker and James Phelps, McGlynn's son-in-law who had been employed by the Company to assemble information for the S–11 Registration, and more recently to gather financial information to supply the banks and other creditors, visited Joseph Schuster at his office in New Prague, Minnesota. Meetings were held involving many hours of consultations on two weekends commencing January 12 and January 18 of 1974. The matters discussed at those meetings were also communicated to McGlynn.

Schuster is a sophisticated businessman and close personal friend of Garmaker having had a business and social relationship over several years. He was a shareholder in McAllister and an investor with Garmaker in real estate in Austin, Minnesota, an investor in various partnership interests, and a major investor in the Company's project at Casper, Wyoming.

The meetings were held to get assistance from an outside party in coming to grips with the situation of the Company and to assist in summarizing its position for the information of creditors including the banks. The parties examined in detail the status of the various projects on an individual basis, determined that the Company was exceeding its cost estimates, and concluded that there was a need for additional capital. Cash flow projections were prepared and eventually supplied to the banks including as indicated the Northwestern Bank. I am satisfied that in the course of the meetings with Mr. Schuster there was also discussion as to the financial situation of the individual participants in view of their guarantees.

By reason of the discussion and examination into the affairs of the Company, it was apparent to all concerned that bank debt and other borrowings totalled $4,212,800.00 in addition to real estate construction credit and permanent financing amounting to some $10,000,000.00 additional. The cash flow projections which anticipated successful completion of the projects and a successful sale of limited partnership interests therein nevertheless contemplated something less than full payment in the course of a year. They also relied on added sources of funds including anticipated earnings of $156,000.00 from the management contracts and a contribution to capital of

$1,000,000.00 by McGlynn and Garmaker personally. In subsequent meetings with the bank, McGlynn and Garmaker indicated the intention not only to insert the $1,000,000.00 but an additional $400,000.00 to $450,000.00.

### D. INSOLVENCY OF THE ENTITIES

#### 1. INTERPARTY DEBT

Over the course of time, McGlynn and Garmaker had become indebted to the Company in an ultimate amount of $135,913.92 for Garmaker and $196,585.41 for McGlynn. It was a part of the understanding of Northwestern Bank that the proposed capital insertion to the extent of some $400,000.00 to $450,000.00 was to be treated as a repayment of the debt of the principals to the Company.

#### 2. McGLYNN–GARMAKER COMPANY

During the preparation of the S–11 Registration Statement, a new corporation was formed to serve as general partner in the projects. I am satisfied that one of the purposes was to avoid the necessity of supplying adequate financial statements of McGlynn-Garmaker Company in connection with the registration. I am equally satisfied that the actual status of the Company was one of insolvency in an amount somewhere between $2,110,000.00 and $3,902,450.00, and that condition subsisted during the entire year 1974.

#### 3. GARMAKER

By his own admission, Garmaker had debts, including liabilities on guarantees of at least $10,000,000.00. His assets although at times very substantial were never sufficient to offset those liabilities, and I am satisfied that Garmaker was insolvent during all of 1974.

#### 4. McGLYNN

McGlynn prepared and signed a personal balance sheet which was submitted to First National Bank under date January 8, 1974 which purported to show a net worth of $1,873,700.00. However I am satisfied and the evidence shows that assets were overvalued, particularly as shown by their ultimate disposition, and that the balance sheet fails to reflect the McGlynn obligations with respect to guarantees of corporate obligations. I am satisfied that in fact McGlynn was insolvent during the entire year 1974 and that his obligations which included all of the guarantees which Garmaker had undertaken were no less than $9,000,000.00 the sum of the claims ultimately filed in his bankruptcy.

#### 5. AWARENESS OF THE SITUATION

I am satisfied in view of the numerous meetings with banks and others, the attempts to generate financial information, and other efforts to save the Company, both McGlynn and Garmaker were well aware of their own and the Company's financial status.

Phelps had been particularly employed by the Company for the purpose of accumulating information as to its affairs and I am satisfied that in the course of continual association he communicated to McGlynn and Garmaker what he discovered in that regard, which served to add to their own more general knowledge of the Company's affairs. Early action was taken in 1974 which reflected that knowledge. On January 30, 1974, the Company contacted the law firm of Robins, Davis & Lyons because of their expertise in dealing with financially troubled companies and businesses. As early as February 14, 1974, Mr. Phelps recognized the pending SEC Registration could not be maintained because of the Company's then financial situation and employed an accountant to advise the SEC, the advice being given on February 20, 1974, that there was no assurance the assets of the general partners and their corporate affiliates would be sufficient to complete the construction of the only continuing projects those involved in Jupiter, Midvale, and Beaumont.

### E. RESULTING ACTIONS OF THE BANKRUPTS

#### 1. EARLY INDICATIONS

Commencing in January, McGlynn and Garmaker embarked on certain courses of action indicative of their knowledge and intention.

McGlynn through an attorney forwarded a certificate for 10,000 shares of ICBS stock for registration out of his name into that of his three children. The attorneys' transmittal letter also indicated that certificates belonging to Garmaker would be forthcoming for transfer into trusts being newly created. It eventuated however that the McGlynn stock was used for other purposes.

Garmaker apparently on January 4, 1974 created separate voluntary irrevocable trusts for the benefit of his two children naming certain relatives as trustees. The indentures recite delivery of $500.00 cash and 5,000 shares of ICBS for each trust. Those shares had been purchased with borrowings from First National Bank and a few days earlier, on January 11, Garmaker had indicated to the bank that his and McGlynn's ICBS stock constituted a source of repayment of the First National loans. In this instance also, for unexplained reasons the stock was used for other purposes.

On January 14 a partnership was formed named Managers of Properties Company, the partners being McGlynn's son-in-law James Phelps, his wife Nancy McGlynn Phelps, McGlynn's two other children, Andrew P. McGlynn and Donald J. McGlynn, Jr., and Walter and Helma Peters the designated trustee of the Stewart and Steven Garmaker trusts just described. The purpose of the partnership was to engage in the management of rental properties including apartment buildings. While the company is now shown to have functioned as such, it is apparent that it was intended to take over the management contracts in McGlynn-Garmaker Company and related entities. If that had eventuated it would have made anticipated management fees unavailable as a source of repayment as suggested to the First National Bank and as a factor in the Company's cash flow projections submitted to all the banks.

## 2. DISPOSITIONS BY GARMAKER

### a. PAYMENTS ON HOME AND INSURANCE POLICIES

Garmaker obtained $160,000.00 from a transaction with Schuster on January 25, 1974 by check payable to Schuster and endorsed to Garmaker. Garmaker instead of depositing the check in his own bank account deposited it in Darlene's which prior to the deposit had a minimal balance of $187.92. The purpose was to avoid the appearance of such a large sum in his account where it would be subject to setoff by his own bank or seizure by other creditors. On the following day January 26, Darlene deposited $179,021.28 including the $160,000.00 Schuster check, $14,900.00 withdrawn from a savings account at Twin City Federal Savings & Loan, and $4,121.28 from miscellaneous sources.

During the ensuing month the funds were laid out to prefer certain creditors, by transfer to Darlene through her corporation Creamery, and to enhance the value of exempt property. Garmaker who had been formerly an insurance agent had life insurance coverage and in that connection he made three payments on February 19, 1974 to repay policy loans and increase cash value of the policies involved. The payments were made to Great West Life in connection with Policy No. 1352299 in the sum of $4,277.93, to Great West Life in connection with Policy No. 1842899 in the sum of $1,330.33, and to General American Insurance with respect to Policy No. 1485840 in the sum of $4,331.44. Also in connection with these policies, Garmaker on February 20 effected a change of beneficiary on the Great Western policies from his estate to his children.

On January 28, 1974, payment of $60,000.00 was made to Midwest Federal Savings & Loan to prepay the mortgage and on February 26, 1974 a payment of $4,053.56 to Hennepin County to pay taxes on the homestead belonging to Richard and Darlene Garmaker.

McGlynn from funds realized through a premature redemption of debentures held in McAllister Company, in a transaction to be later described, made a further payment of $10,764.76 on the home mortgage and an additional payment of $10,000.00 to repay premiums on another life insurance policy.

### b. OTHER DISPOSITION OF THE REMAINING SCHUSTER FUNDS

Out of the Schuster proceeds payments were made through Darlene's account in the sum of $47,700.00 to her corporation The Creamery in which Garmaker had no direct interest, $5,000.00 to Wayne Gustafson who was the vendor on a contract for deed of the premises occupied by the Creamery and other dispositions as follows:

$19,000.00 paid to Farmers Terminal Bank on January 28, 1974 in payment of Garmaker's personal loan made in October or November 1973. Garmaker was a director of the bank and admittedly concerned about the propriety of such loan which had been initiated to obtain funds to repay his relative Walter Peters for a previous loan from Peters for investment in Diversified Bank.

$6,500.00 was paid to Walter Peters at the same time to repay Peters for a separate loan in that amount which Garmaker had invested in BelAir, one of the projects.

Payment of $25,000.00 to Carol Meredith to repay her for $25,000.00 which she had advanced to him for investment on her behalf. Garmaker had in fact deposited the money received from Meredith in his account at Northwestern Bank from which account he had paid $10,000.00 to the Penalles Bank of Florida in payment of a loan which he had taken there to repay Walter Peters. The balance of the Meredith money $15,000.00 had been deposited in a new savings account at Twin City Federal denominated "R.E. Garmaker, Trustee" and that account was the source of the $14,900.00 subsequently used in Darlene Garmaker's account to help fund the Garmaker dispositions.

### c. THE SCHUSTER TRANSACTION

Garmaker received the $160,000.00 check from Schuster on January 24, 1974. Contemporaneous with receipt of that check Garmaker delivered his promissory note of that date which note recited that it was secured by "10,000 shares of ICBS and 2,514 shares of McAllister and other collateral" reciting that the ICBS and McAllister were delivered contemporaneously. The documentation with respect to that security however suggests and I find that the loan agreement, promissory note, security agreement and financing statement were prepared at some subsequent date, most probably March 11, 1974, when the signed copies were forwarded to Schuster by letter of that date. In addition to the mentioned security, there is also an assertion of security in shares of the Creamery and a Chateau Shelard note and mortgage and I make the same general finding with respect to those items.

### d. THE ACQUISITION AND HISTORY OF THE SCHUSTER COLLATERAL

Garmaker bought his ten percent interest in ICBS in 1972 with $50,000.00 borrowed from First National Bank and was later required to pay an additional $20,000.00. The total cost to him was $70,000.00, the value of the stock as shown on his balance sheet. McGlynn and Schuster were also shareholders in that corporation. McGlynn and Garmaker had described ICBS to the banks as the cattle breeding operation which was expected to bring in $1,000,000.00 for injection into Company and for payment of bank borrowing. It was so described to the Northwestern Bank and as one possible source of repayment during the meeting with the First National Bank on January 11, 1974. It was within a few days after that bank's officer had confirmed that understanding that Garmaker promised the ICBS stock as well as McAllister stock to Schuster, thus removing that source of possible repayment.

Garmaker had also tacitly committed the McAllister stock, and impliedly the debentures to the same end but had expended those anticipated funds as well without regard to that commitment.

The McAllister stock, and the concomitant debentures had been acquired by Garmaker and McGlynn over a period of time through commission earnings, or on sales or finding transactions for McAllister. Their statement showed the total value of their holdings in McAllister at $300,000.00, of

which the debentures represented $40,-000.00. They mentioned disposition of the stock and debentures in meetings with the Northwestern Bank as a means of obtaining the anticipated infusion of capital into Company. The use of the stock by Garmaker as additional security, if valid, constituted a disablement with respect to that indicated source of repayment.

The stock of the Creamery which was delivered to Schuster belonged to Darlene Garmaker. Garmaker represented to Schuster at the time of the transaction that its value was approximately $30,000.00. Other evidence would indicate a range of value from $10,000.00 to $30,000.00. Out of the Schuster transaction however a total of $52,700.00 was paid directly to the Creamery or its contract vendor. Out of that sum $37,700.00 was used to pay notes on which Garmaker was personally obligated but only as an accommodation party and not as a principal. The payments in excess of the value of the Creamery stock consequently were volunteered to Darlene, and in view of their relationship and the subsequent bankruptcy constituted a fraudulent transfer.

The Chateau Shelard note and mortgage had their genesis in the loan made in 1973 by First National Bank to McAllister in connection with the Chateau Shelard project, a limited partnership in which McAllister and McGlynn were general partners. The security given the bank included $70,000.00 of Garmaker's assets loaned by him for that purpose. By consent the bank sold that security on January 16, 1974 and applied it to the debt. There was no prior understanding or agreement between the parties as to the consequences of the loss of the Garmaker contribution. Sometime after January 16, Chateau Shelard gave a note to Garmaker in the sum of $92,700.00. The note was executed by Garmaker on behalf of McAllister as its corporate general partner and by McGlynn as its individual general partner. A real estate mortgage was given to secure the note which was filed for record on February 7, 1974. In view of his position with McAllister and his intimate association with the Chateau Shelard limited partnership and project, it was at least improper for Garmaker, and McGlynn, to give a note in that amount which on its face, assuming an obligation of $70,000.00 was usurious, even if Garmaker's explanation be credited that the difference was necessary to produce a net of $70,000.00 if the note were sold at a discount.

### 3. THE REDEMPTION OF McALLISTER DEBENTURES

As indicated McAllister was a publicly held company in which McGlynn, Garmaker, and their Company owned approximately fifty-two percent of the outstanding shares there being some forty-seven other shareholders. All shareholders held debentures ratable to their shares. Garmaker was president and a director of McAllister and McGlynn a substantial shareholder, consultant, and intimately involved in its affairs by reason of his participation in commissions generated by purchase and sale of property. By reason of their participation and association in the operation of the company, they were in a fiduciary relation to that company.

The major asset of McAllister was 38 acres of undeveloped land in Eden Prairie at the intersection of Interstate Highway I–494 and County Road 18. Its shareholders at an annual meeting on October 1, 1973 had determined it was necessary to liquidate McAllister and agreed that a plan of liquidation would be arrived at. The liquidation contemplated exchange of the I–494 property for shares in an appropriate real estate investment trust. There was neither discussion nor authorization for mortgage or any other disposition of the property. However, McGlynn and Garmaker on February 22 mortgaged a 12.59 acre portion of the tract to secure a $250,000.00 loan which after payment of a prior mortgage of $35,-101.38 a provision for payment of interest of $30,000.00 and other costs resulted in net proceeds to McAllister of $165,315.43. The interest cost on the note and mortgage was high; five percent over prime, the prime then being eight and one-half to nine percent. In contrast the outstanding debentures of McAllister $42,000.00 due on May

29, 1974 and the remainder due at various dates after May 29, 1975 drew interest only at the rate of five percent.

The net proceeds of the loan was used to make pro-rata payments to the debenture holders without respect to their due date. At the same time McAllister was overdue on its obligation to First National Bank of $44,558.00 and in the January 11 discussions with officers of that bank Garmaker had promised it would be paid, $50,000.00 by February 15 and the balance by April 1. No such payments were made.

The testimony demonstrates that the mortgage was effected by McGlynn and Garmaker without authorization by the shareholders or directors of McAllister and that the effect of the mortgage was at high cost and inconsistent with liquidation in that it would necessarily impair or inhibit the sale of the land or its eventual trade to an appropriate REIT.

McGlynn and Garmaker both intended the mortgage and the use of the proceeds in partial redemption of the debentures to simply put themselves in funds, and accordingly for the purpose of making the transfers referred to elsewhere in these findings. Their actions were contrary to their fiduciary duties and without authority. Their purpose in connection with their own immediate affairs was in addition to place that asset beyond the reach of their own creditors.

### 4. McGLYNN DISPOSITIONS

#### a. PAYMENTS ON MORTGAGE AND INSURANCE

McGlynn received approximately $33,000.00 in the redemption of McAllister debentures. From that he paid $20,587.59 to Equitable Life Insurance Company in payment of the entire balance of the mortgage on his homestead and prepaid premiums of $4,141.50 to Equitable Life Insurance Company.

#### b. OTHER TRANSFERS

At various dates from mid-January through early March of 1974 McGlynn and his wife JoAnn made substantial dispositions of their most readily available assets, apparently in cash and without maintaining records or using his bank accounts. Those transfers are as follows:

(1) The McGlynns owned a Florida condominium on which they had paid down $7,000.00. In mid-January, they transferred title to "604 Treonon Corporation", the only shareholders of which were their children. The only consideration was the corporation's agreement to assume the $38,000.00 mortgage. Prior to the transfer, McGlynn had attempted to sell the property without success leaving the transfer as the only alternative.

(2) McGlynn in January sold 1,000 shares of Apache stock for $12,000.00 and from the proceeds repaid a loan at Midland National Bank in the amount of $8,000.00.

(3) In January or February, McGlynn sold land located in Eden Prairie which he had purchased for $13,500.00 to Michael Adams for $10,000.00, and, in February borrowed $10,000.00 from Dennis Thompson giving a pledge of his interest in a shopping center in Coon Rapids.

(4) On February 13, McGlynn paid $15,000.00 in cash into a trust he had created for his son Donald, the funds being partially from the sale to Adams and partially from the Thompson loan.

(5) About February 10, McGlynn transferred title to a 1972 Pontiac automobile to his son Donald, the automobile having an estimated value of $1,200.00 to $1,500.00. He testified that it was his practice to give an automobile to each of his children as they graduated from high school, but Donald had not yet graduated.

(6) In February, McGlynn sold an additional 1,000 shares of Apache stock for $12,000.00 and used the proceeds in part to pay off the loan at the Farmers Terminal Bank in the amount of $30,000.00.

(7) In February, McGlynn sold 3,000 shares of M.E.I. stock for $6,000.00.

(8) JoAnn owned two policies of life insurance with National Life Insurance Company, Policies No. 1294568 and 1352237 on the life of Donald McGlynn. On February 13, she changed the designation of beneficiary from herself to the McGlynn children.

(9) JoAnn also owned a Policy No. 1179717 with Crown Life Insurance Company on the life of Donald McGlynn. On February 18, she redesignated the beneficiary from herself to the McGlynn children.

(10) In February, JoAnn McGlynn sold her 550 shares of Coke Midwest for $4,400.00, and McGlynn sold 100 shares of Northwest Airlines stock for $2,500.00.

(11) McGlynn in February pledged his and JoAnn's interest in Swanson McGlynn Company, shown on his balance sheet as worth $58,500.00 and gave his promissory note to John Adams for $32,000.00. $20,000.00 of this was to repay prior obligations and $12,000.00 was for new cash.

(12) McGlynn owned Policy No. 12998504A with Metropolitan Life Insurance on his own life and on February 26, he changed the beneficiary from his wife JoAnn to the McGlynn children.

(13) On February 27, McGlynn and Garmaker effected an exchange of ownership of life insurance policies each had previously owned on the life of the other. McGlynn owned National Life Insurance Company Policy No. 1369462 on Garmaker, and Garmaker owned National Life Insurance Policy No. 1368051 on the life of McGlynn. The policies had previously been in effect to permit a buy out of either party's interest in the event of death. The insurance policies were not germane to that purpose in February in view of the financial status of the company.

(14) McGlynn had an interest in the Olympic Hills Golf Course in which he had invested $93,000.00. In February or March, he used that as security to obtain a loan of $25,000.00 from Rudy Luther.

(15) In February, McGlynn exchanged 5,000 shares of ICBS and 800 shares of Central Bank stock with his sister Mrs. Holland in return for $12,000.00 cash and Mrs. Holland's $25,000.00 interest in the Diversified Bank Investment Company.

(16) About March 15, McGlynn placed Central Bank stock worth approximately $18,000.00 into a trust which he had created for his son Andrew.

From these transactions, the McGlynns received cash of at least $105,900.00 and in obtaining the cash employed assets worth $280,000.00 as valued on McGlynn's financial statement. From the cash dispositions were made to the children as indicated, and, assuming the value of the life insurance policies to be cash value as of the date of bankruptcy, the total transfers to the children amounted to $64,192.07 in cash and cash value.

## F. DISPOSITION OF OTHER BANK INTERESTS

In prior discussions with the lending banks, the McGlynn and Garmaker interests in various banks were suggested as the source of additional equity capital for insertion into the company. McGlynn and Garmaker did make attempts to sell such interests and the bulk of the proceeds received was used for company purposes albeit in some instances with collateral advantage to the individuals by reason of guarantees or other obligation.

The interest in Farmers Terminal State Bank was sold on February 8, 1974. Out of the proceeds $180,000.00 was repaid to Rudy Luther and Orthopedic Consultants, P.A. This apparently was to repay an unrelated sum advanced by them for investment and not shown to have any involvement in the acquisition of the bank stock. $81,065.44

was paid into a collateral account at Marquette and used for company purposes. $73,660.54 was paid into an escrow account at Shelard National Bank, which apparently served some company purposes, and $24,544.20 was paid on company indebtedness to William Bergstadt.

Bergstadt used that money to repay his own loan at Farmers Terminal. Since McGlynn and Garmaker were officers of that bank, it was apparently a part of the understanding incident to the sale that loans related to their interest should be satisfied. $1,000.00 went to Phelps for acting as trustee, and $48,364.25 was paid over to Robins, Davis & Lyons about March 29 for their continued representation of McGlynn and Garmaker, and the Company.

The Prairie Development stock (representing Valley City Bank) was also sold in February and $36,000.00 placed in the collateral account at Northwestern and used for Company purposes.

The Diversified Bank stock (representing the Waterloo Bank) was liquidated in June. $112,818.65 was paid to Internal Revenue Service on a Company tax obligation with respect to which McGlynn and Garmaker may well have had some personal obligation. $65,633.34 was paid directly on Company obligations in which Marquette Bank was involved. Carl Pohlad of the bank had been originally involved in the purchase of Diversified Bank shares and on behalf of Marquette he apparently imposed that condition on the sale. Again $13,351.00 was paid over to Robins, Davis & Lyons for their legal representation in connection with the financial difficulties. The Central Bank stock which had been referred to in the meetings apparently was not saleable, or could not be sold, and passed to the trustee.

## G. FURTHER MEETING WITH BANKS, AND INCIDENTAL TRANSACTIONS

McGlynn and Garmaker dealt with the banks on an individual basis into January of 1974. Commencing in February 1974, there was a series of meetings of McGlynn, Garmaker, Mr. Phelps, and their attorneys with the three principal lending banks. At meetings between February 1 and February 11 representatives of the three banks made it clear that there would be no further advance of funds and that the Company should delay institution of any new projects. The understanding was that McGlynn and Garmaker were to follow up on the matter of injection of additional capital as soon as possible. Again there was discussion of liquidation of the bank interest, talk of a possible loan of $500,000.00 from Schuster to Garmaker and an understanding that the new capital would be in the form of $400,000.00 reduction of accounts due from the officers and a further $1,000,000.00 of subordinated debt.

A further common meeting was held February 25th, at which Northwestern learned of some of the attempts by McGlynn and Garmaker to pay or collateralize friends and investors with personal assets. The next day there was a meeting with representatives of the Northwestern and Marquette Banks at which time Phelps was named general manager of the Company. It was the intention of the Northwestern to take a pledge of the McAllister stock on the assumption that the principal asset of the Company was the land at 494 and 18 which was said to have a value of up to 1.2 million dollars and an outstanding mortgage debt of $250,000.00. Another meeting was held with Mr. Schneider of the Northwestern on March 1, 1974 at which time he apparently learned of the sale of M.E.I., ICBS, and Apache stock and the use of $30,000.00 to repay a loan at Farmers Terminal. It would also appear from his notes that he became aware in late February of some of the transfers to the McGlynn and Garmaker children.

The Northwestern also learned in early March that the filing of a Chapter XI proceeding was contemplated, that McGlynn had pledged the stock in Olympic Hills for $25,000.00, and had received $10,000.00 from Dennis Thompson as previously mentioned in these findings. Further meetings were held in March and it became clear that the

personal financial situation of McGlynn and Garmaker had become the primary concern of Robins, Davis & Lyons and they demanded and received an additional fee payment of $48,364.25 from the escrow account at the Shelard National Bank.

On April 1, McGlynn and Garmaker entered into an agreement with Phelps for his services in connection with their personal financial situation. On the next day, Robins, Davis & Lyons met with Mr. Anderson of the Marquette and there for the first time apparently learned of the creation of the Manager of Properties Company and of the education fund. The attorneys were not generally aware of the transfers and indicated that there was no danger of their clients using funds to pay off homestead, although, in fact, those payments had already been made by McGlynn and Garmaker. There were further meetings in April and May in which the bank officers learned something about the transfers and transactions detailed in these findings although it would appear that as late as May 24 Anderson of the Marquette still had the impression there had been no erosion of personal assets.

On June 13, McGlynn and Garmaker executed financing statements in favor of Phelps and entered into security agreements and financing statements with their attorneys Robins, Davis & Lyons purporting to transfer all assets to Phelps and the attorneys. The officer of First National Bank on analysis of the financial statements dated May 29, 1974 indicating the insolvency of the Company and in view of the information which had been received with respect to their personal activities noted in his loan status report of June 17, 1974 that the three banks had signed an involuntary petition in bankruptcy against the Company and both individuals.

Garmaker in May or June 1974 transferred his boat which had substantial value to John Steinbergs a neighbor and investor in the Helena project.

The involuntary petitions in bankruptcy were filed against McGlynn and Garmaker on July 2, 1974, and adjudications were entered in each instance by default on July 30, 1974. The Company was adjudicated December 6, 1974 and the voluntary petition of JoAnn McGlynn was not filed until a later date January 23, 1975 and adjudication occurred that day.

## H. INTENT

It was the intent of both McGlynn and Garmaker to keep the Company alive either in the end to save it, or failing that to maximize the return from its assets whether the corporation itself were saved or not. In this both were aware of and motivated by the fact that a maximum return would reduce their exposure to responsibility for corporate debt under their guarantees.

Both McGlynn and Garmaker were aware no later than mid-January 1974 of the serious financial situation of the Company and consequently of their own. Both of them then commenced the course of action detailed in the foregoing findings with the intention to protect themselves against personal financial disaster by disposing of their most liquid and available properties in the transfers to others, both to relatives where they retained in effect an equitable benefit, and to others such as certain of the investors, who had supplied funds not yet invested and apparently comingled among other assets for the purpose of rectifying that wrong. Their purpose was similarly to secrete such assets from their creditors by the direct payments and transfers resulting in the enhancement of their home and insurance properties.

## DISCUSSION

### A. THE BASIC STATUTORY PROVISIONS

The Bankruptcy Act in § 6 (11 U.S.C. § 24) recognizes applicable exemptions under state and federal law:

§ 6. Exemptions of Bankrupts. This Act shall not affect the allowance to bankrupts of the exemptions which are prescribed by the laws of the United States or by the State laws in force at the time of the filing of the petition in the

State wherein they have had their domicile for the six months immediately preceding the filing of the petition, or for a longer portion of such six months than in any other State: *Provided, however,* That no such allowance shall be made out of the property which a bankrupt transferred or concealed and which is recovered or the transfer of which is avoided under this Act for the benefit of the estate, except that, where the voided transfer was made by way of security only and the property recovered is in excess of the amount secured thereby, such allowance may be made out of such excess.

No federal exemption is involved. The effect of the proviso is not of immediate relevance but will be mentioned in context later.

The state law applicable to the exemption of homestead is M.S.A. § 510.01 and § 510.-02 as follows:

510.01 HOMESTEAD DEFINED; EXEMPT; EXCEPTION. The house owned and occupied by a debtor as his dwelling place, together with the land upon which it is situated to the amount hereinafter limited and defined, shall constitute the homestead of such debtor and his family, and be exempt from seizure or sale under legal process on account of any debt not lawfully charged thereon in writing, except such as are incurred for work or materials furnished in the construction, repair, or improvement of such homestead, or for services performed by laborers or servants.

510.02 AREA, HOW LIMITED. The homestead may include any quantity of land not exceeding 80 acres, and not included in the laid out or platted portion of any city. If it be within the laid out or platted portion of such place its area shall not exceed one-half of an acre.

The status of life insurance including incidents such as loan, cash value and accumulated dividends is not dealt with in the general Minnesota Statute but is contained within M.S.A. § 61A.12, a part of the insurance code, as follows:

61A.12 BENEFICIARIES. Subdivision 1. Proceeds of life policy, who entitled to. When any insurance is effected in favor of another, the beneficiary shall be entitled to its proceeds against the creditors and representatives of the person effecting the same. All premiums paid for insurance in fraud of creditors, with interest thereon, shall inure to their benefit from the proceeds' of the policy, if the company be specifically notified thereof, in writing, before payment.

Subd. 2. Exemption in favor of family. Every policy made payable to, or for the benefit of, the spouse of the insured, or after its issue assigned to or in trust for a spouse, shall inure to that person's separate use and that of the children of the insured or the insured's spouse, subject to the provisions of this section.

## B. BASIC CONSIDERATIONS AND CONTENTIONS

While the contentions of the parties are multifaceted, their disposition depends on the answers to certain fundamental questions as follows:

1. Does the property claimed by the bankrupt to be exempt fall within the scope of some defined exemption afforded by state law?

2. If the property claimed exempt does fall within the literal definition provided by state law, has the bankrupt by his activities forfeited the right to claim the benefit of exemption either entirely, or with respect to the enhancement of the value of such property resulting from such activity?

3. Has the bankrupt by his activities forfeited his right to claim the benefits conferred by § 6 of the Bankruptcy Act, and thus lost all right to exemption?

4. To the extent that a bankrupt has made preferential payments or fraudulent conveyances putting property in the hands of third parties in some manner flaw his claim of exemption so as to subject otherwise exempt property to a charge for the benefit of the trustee and

estate in an equivalent amount out of otherwise exempt property?

## C. THE INSURANCE "EXEMPTION"

Leaving for later discussion the effect if any of the manner and means employed to enhance the value of the policies, a threshold question exists whether the Minnesota Insurance Code Provisions referred to constitute an "exemption" at all within the meaning of § 6 of the Bankruptcy Act. The Minnesota Supreme Court held in *Murphy v. Casey,* 150 Minn. 107, 184 N.W. 783, that in spite of the reservation by the insured of the right to change beneficiary such policy was exempt from the claims of his creditors. That such exemption was properly within § 6 of the Bankruptcy Act was recognized in *Ralph v. Cox,* 8th Cir., 1 F.2d 435 (1924).

Insurance provisions such as those found in the Minnesota Code are common throughout the country and phrased in substantially identical terms. The result of the *Cox* case was in accord with the great weight of authority, as recognized by Judge August Hand in *Matter of Messinger,* 2d Cir., 29 F.2d 158 (1928) where while recognizing the purpose of such statutes to protect the beneficiaries and not the policy owner the Court nevertheless found that the proceeds referred to in the statute, which in other cases have been held to encompass the benefits of the policy, nevertheless were exempt from all claims of the creditors of the insured policy owner, and "exempt" from the claims of the trustee in his later bankruptcy proceedings, even though without exemption the policy and all of its attributes would pass to the trustee pursuant to § 70a of the Bankruptcy Act. See *Holden v. Stratton,* 198 U.S. 202, 25 S.Ct. 656, 49 L.Ed. 1018.

The opinion of Judge Hand is illuminating in its particular recognition of the interrelationship between § 6 and § 70a of the Bankruptcy Act, and the possibility that the statutes in their intended benefit of the beneficiary, and not of the insured owner of the policy, might arguably not be deemed exemptions but merely protective of the beneficiary.

"The statute does not exempt the bankrupt if he exercises his reserved power to change the beneficiary for his personal advantage, and, indeed, precludes an exemption in such case by saying that the "beneficiary * * * *other than the insured*" shall be entitled to the proceeds and avails. But it plainly does attempt to exempt the "proceeds and avails," so far as beneficiaries, other than the bankrupt, may have an interest in the policy. It does not protect the insured against his creditors, and only seeks to prevent them from affecting the rights of the beneficiaries other than himself. While the insured may still change the beneficiary, and appoint to himself under the reserved power, by reason of the New York Insurance Law, he cannot be compelled to do this, as he would have been prior to the enactment of section 55a, because, to do so, would deprive the beneficiaries of their interest. *Thus there is an allowance of an exemption to the bankrupt to the extent of the right of the trustee to compel him to exercise the reserved power.* While the benefit inures directly to the beneficiary, and not to the bankrupt, yet it is an exemption of the bankrupt himself to the extent indicated.

This conclusion is in accord with the weight of authority in construing similar state statutes." (emphasis added)

There are no reported cases to the contrary and the Bankruptcy Court in Minnesota has uniformly recognized the exempt nature of insurance policies from that time until the decision in 1974 in the unreported case of *Donald Leslie Charlton,* Bankrupt No. 5–72–54 in the Fifth Division of the District of Minnesota. In that case, Judge Heaney sitting by designation as United States District Judge on August 16, 1974 affirmed the determination by Bankruptcy Judge McNulty that the code provisions no longer constituted an "exemption" within the meaning of § 6 of the Bankruptcy Act. That changed result was based upon Judge McNulty's analysis and reading of an intervening decision of the Minnesota Supreme

Court in *Fox v. Swartz,* 235 Minn. 337, 51 N.W.2d 80 (1952). In the *Fox* case, the Court to meet certain constitutional problems had characterized the protection afforded by the statutory provisions as being less in the nature of an exemption and more in the nature of a preference for the beneficiary of the policy as against the creditors of its insured owner. Judge McNulty on the predicate that change in terminology evidenced change in effect then concluded that while the statute might operate as a restriction against process on behalf of the owner's creditors it nevertheless preserved to him the right to change beneficiary, a right which, absent "exemption", passed to the trustee under § 70a of the Bankruptcy Act as an asset of the estate.

It was certainly not the intention of the Minnesota Court to read out an exemption for it had stated 235 Minn. at p. 345, 51 N.W.2d 80:

> "If we were to hold that the cash-surrender option of the insured, or any other option of the insured under the policy prior to its maturity, is a property right which is not *exempt,* but is available to the insured's creditors, the protective benefits would be wiped out, and we would thereby defeat the statutory purpose." (emphasis added)

If the matter were open to me to assess, I would conclude, that the effect of *Fox v. Swartz* was not to eliminate an exemption but to clarify and expand its scope so as to encompass all attributes of the life insurance policy. That at least had been the impression of the mentioned bar in intervening years until the affirmance in *Charlton.* Whatever the terminology employed by the Supreme Court, I would not assume that it was its intention to circumscribe the protection afforded by the statute and its purpose was to insulate all facets of the insurance policy from the claims of all creditors. That is the gist of an exemption within the meaning of § 6 as reflected in the *Messinger* case, supra. See also *Matter of Brissette,* 9th Cir., 561 F.2d 779, 783. The fact that absent exemption the right to change beneficiary would constitute a power passing to the trustee under § 70a is not crucial for that is a common attribute of almost any type of otherwise exempt property, if the exemption be removed.

Judge McNulty's order was affirmed without further discussion by Judge Heaney on August 16, 1974. Absent that affirmance and if the matter were still open to me, I would consider *Ralph v. Cox* to remain binding authority, and that the insurance provisions afford an exemption, such exemption being merely expanded and not abrogated by the Minnesota Supreme Court in *Fox v. Swartz.*

A coordinate court might still feel free to continue to follow the last expression of the Court of Appeals in *Ralph v. Cox.* However as an adjunct court I must give appropriate deference to the latest expression of the district court, and am compelled to find that Minnesota does not afford an insurance exemption.

However, in view of my doubts in the matter, I will consider and rule upon the other contentions of the trustee founded upon the activities of the bankrupts and offered generally in support of his denial of exemption, as if the insurance policies would otherwise be exempt.

## D. SCOPE OF EXEMPTION

It appears that the real property claimed exempt by each bankrupt somewhat exceeds the area allowable under the Minnesota Homestead Exemption Law. The matter of that excess is not dealt with in the present case but will be the subject of agreement by the parties, or if necessary of further proceedings in the light of the disposition of the claim of homestead generally. The scope of the law with respect to ownership and occupancy is otherwise satisfied and the provision is broad enough, unless the immunity has been lost in whole or in part through the actions of the bankrupt to be an effective cover for the real property.

If the provisions of the Insurance Code constitute an exemption at all, then the terms are sufficient to insulate the various insurance policies mentioned in the findings

as to all of the incidents of the policies including the retained right to change beneficiary, to realize on cash or loan value and to recover dividends, unless by the courses of conduct detailed in the findings that exemption has been lost in whole or in part.

## E. ENTITLEMENT TO EXEMPTION

### 1. LAW APPLICABLE

Except for possible application of certain broad equitable powers resident in the Bankruptcy Court, § 6 of the Bankruptcy Act dictates that the exemptions here claimed under state law with respect to homestead and insurance are as prescribed by state law, and except with respect to the effect of the proviso the construction of such state laws by the courts of the state are controlling in bankruptcy proceedings. 1A *Collier on Bankruptcy,* 14th ed., § 6.02(3).

### 2. MINNESOTA LAW

The following discussion must be prefaced with a caveat that, as counsel apparently agree, the availability of the exemptions under the factual circumstances of this case under Minnesota law is an open question. Consequently the following discussion is not restricted to binding authority but simply indicates a search for an appropriate eventual disposition of this case.

There are two kingpin holdings in Minnesota case law relative to the availability of homestead exemption in the face of a claim of fraud.

The first significant case is *Jacoby v. Parkland Distilling Company,* 41 Minn. 227, 43 N.W. 52 (1889). The Court there dealt with an action to determine adverse claims commenced by the wife of the judgment debtor against whose real property certain liens were asserted by defendants. The property was a commercial building containing a portion, some rooms, suitable for residence purposes. After incurring the debts for which liens were claimed by the defendants the plaintiff and her husband moved into and made their residence in one of the rooms in the building and claimed the entire premises as homestead. The holding of the cases is reflected in the headnote stating:

> "An insolvent debtor, in securing a homestead for himself and his family by moving into and occupying as his dwelling a building which he owns, for the expressed purpose of holding it as exempt, takes nothing from his creditors in which they have any vested right, and hence commits no legal fraud."

The language of the opinion by Justice Mitchell however is more expansive in equating the mere occupancy of the property, and thus its conversion of non-exempt into exempt property, with a conversion of other non-exempt property and the use of its proceeds in the purchase of a house or homestead, commenting:

> "A debtor in securing a homestead for himself and family, by purchasing a house with non-exempt assets, or by moving into a house which he already owns, takes nothing from his creditors which the law secures to them, or in which they have vested right. He merely puts his property into a shape in which it will be the subject of a beneficial provision for himself, which the law recognizes and allows. Even, if he disposes of his property subject to execution, for the very purpose of converting the proceeds into exempt property, this will not constitute legal fraud."

No subsequent case has questioned the right of the debtor to occupy property already owned for the purpose of claiming his homestead rights, although that action necessarily constitutes a conversion of non-exempt into exempt property and removes from creditors certain property which would otherwise be available. The holding of the *Jacoby* case was applied and reinforced in the later case of *O'Brien v. Johnson,* 275 Minn. 305, 148 N.W.2d 357 (1967).

The Minnesota Supreme Court has apparently never had occasion to deal directly with a situation involving a "conversion" of non-exempt into exempt property other than by a change in occupancy, and thus we

have no Minnesota case authority governing the availability of the homestead exemption under the facts of the present case.

The issue of the right to effect a conversion by sale and purchase has arisen in a collateral fashion in two cases, with interesting comments by way of dicta therein. In *Small v. Anderson,* 139 Minn. 292, 166 N.W. 340 (1918) a creditor obtained a verdict against defendant at a time when the defendant owned non-exempt real and personal property in excess of the sum of the verdict. Prior to the entry of judgment the defendant conveyed all of the non-exempt property to his wife in consideration of which she conveyed to the defendant a tract of land then standing of record in her name but where both she and the defendant already resided. The plaintiff, representing creditors, sought to set aside this transfer as a fraudulent conveyance and defendant responded in part that the sole purpose of the exchange of property was to secure a family homestead in the name of the defendant and relying on the dicta in *Jacoby* insisted that regardless of his intent he had a legal right to employ his non-exempt property to that end. The Supreme Court refused to apply the *Jacoby* case in that broad sense commenting that the record was insufficient to show that defendant's sole intent and purpose in the conveyance was to acquire the homestead, since he already resided in the property and stated that "the rule of the *Jacoby* case should not be extended to a case of that kind * * *".

In another fraudulent conveyance action, *Nash v. Bengtson,* 179 Minn. 7, 228 N.W. 177 (1929), defendant claimed an unrestricted right to exchange his non-exempt assets for exempt in order to secure the benefit of a homestead. He had conveyed substantially all of his non-exempt, real and personal property to relatives in return for legal title to 74 acres of homestead property. The Supreme Court sustained the lower court's finding that the defendant's transfers were made for the purpose of putting his property beyond the reach of his creditors and his purpose was to defraud them. In rejecting the argument that he had an unrestricted right to trade such non-exempt for exempt property the court commented:

"As to the right of an insolvent debtor to secure a homestead for himself and family and under *certain conditions* to exchange non-exempt property for exempt in order to secure the benefit of the statutory exemptions, there is no doubt. However, the facts in this case do not bring defendants within that rule, as an examination of the following authorities cited by defendants will disclose: [citing *Jacoby,* and others]

There was here *undue and unusual haste* in making the transfers. Edwin was an *embarrassed debtor.* The conveyances were between near relatives and were prima facie fraudulent as to pre-existing creditors. *They were not made in good faith,* nor was there a fair consideration. [citations omitted]

All the facts and circumstances disclosed by the record clearly warranted the court in reaching the conclusions arrived at. *The transfer on January 7, 1928, was manifestly made for the purpose of putting Edwin's property beyond the reach of his creditors. The purpose was to defraud them. If defendants were successful here, that end would be accomplished. It was the duty of the court to prevent the attempted fraud.*" (emphasis added)

The *Small* and *Nash* cases did not deal with a claimed exemption but are mentioned here simply to indicate the Supreme Court's recognition that the "conversion" referred to in the dicta in *Jacoby* and *O'Brien* is not to be deemed innocent merely by reason of an eventual investment in homestead property.

As previously indicated, I deem the question of availability of exemption under the facts of this case to be an open question, and while that question is to be decided as a matter of Minnesota law the statements by way of dicta in *Jacoby* and *O'Brien* while not totally irrelevant cannot found a firm basis for decision here. See *In Re Sullivan,* 8th Cir., 148 F. 815. As stated in *New England Mutual Life Ins. Co. v. Mitchell,* 4th Cir., 118 F.2d 414, 420:

"We are not required, however, to speculate as to how the state court might decide the question before us if it has not already decided it. Nor should we surrender our own judgment as to what the local law is on account of dicta or other chance expressions of the judges of the local courts . . . . . To base a decision upon dicta, or upon speculation as to what the local court might decide in the light of dicta, would be to depart from our solemn duty in the premises and embark upon a vain and illusory enterprise."

There are certain underlying considerations helpful in determining under state law, as under federal law, entitlement to exemptions which are otherwise facially applicable to the property in this case. The first consideration is that the bankruptcy court is a court of equity both in its abhorrence of inequitable conduct, *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and governed by equitable principles in the construction of the Bankruptcy Act and presumably other statutes. See *Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966).

It is the purpose of the Bankruptcy Act to afford to the honest debtor all the protective benefits of applicable exemptions but it should not strain to expand the availability of exemptions beyond that required, and particularly not to assist in the perpetration of a fraud. See *Paton v. England,* 9th Cir., 462 F.2d 1099 (1972), *In Re White,* D.C., Cal., 221 F.Supp. 64 (1963), and *Matter of Vecchione,* S.D.N.Y., 407 F.Supp. 609, 9 Collier Bankruptcy Cases 537 (1976).

Recognizing that the issue here is not the facial construction of the statute which would be entitled to a most liberal construction, but rather to the availability of its benefits it is important to recognize the Minnesota court's view of the purpose of exemptions. In *Grimes v. Bryne,* 2 Minn. 89, Gil. 72 (1858), the Court indicated in that regard:

"*Laws of this nature are not intended to aid debtors in defeating the just demand of their creditors,* but are passed in that humane and enlightened spirit of legislation which considers the preservation of the family, and the means of supporting and educating the children, and maintaining the decencies and properties of life, as paramount to the temporary inconvenience that the creditor may be subjected to in the collection of his demand . . . *It is intended as a shield to the unfortunate, and not to increase the facilities of the dishonest to avoid justice.* It does not contemplate nor comprehend that deliberate and intentional insolvency which would invest all its means in the catalogue of exempted property and then proclaim its inability to pay . . . . . " (emphasis added)

See also *Esty v. Cummings,* 75 Minn. 549, 78 N.W. 242 (1899).

The Bankruptcy Court in Minnesota has recognized the intent of the law in an unreported case *Matter of Lois Erickson, etc.,* Bankrupt, No. 4–77 BKY 38, (Memorandum Decision of August 19, 1977), where Bankruptcy Judge McNulty observed the distinction of the use of the homestead exemption "for avoidance and evasion", indicating that such right "should not degenerate into a vehicle for fraud or a tool for fraudulent evasion".

The Minnesota Supreme Court has not treated the homestead exemption statute as an absolute, and it is clear by its holdings that the benefit of the exemption may be lost in those instances where attempt is made to assert such claim to resist the equitable remedy of constructive trust. See 9A *Dunnell Minn. Digest Homestead,* Sec. 4208.30 (3d ed. rev. 1977) and the cases there cited. Under the present state of Minnesota law there is no indication that such represents the outer most limits in denying availability of the homestead exemption.

The Minnesota Supreme Court has more than once indicated its displeasure at the possible use of the homestead exemption to perpetrate frauds upon creditors and recommended to the legislature specific prohibitions against such effects commencing with the opinion of Justice Mitchell in *Jaco-*

*by* repeated in the opinion of Justice Otis in the *O'Brien* case with the added statement:

"For over one hundred years we have deplored the injustices which have arisen from the application of our statutory exemptions. The purpose of the constitutional exemption as we see it is to render the family home secure, not to permit a debtor *who already enjoys that protection* to escape his just obligations by seeking refuge in valuable income-producing property of which his homestead is but a small part. Nevertheless, the law is so well settled that however distasteful it may be, we feel reluctantly compelled to apply it."

The well settled law referred to is of course the construction of the homestead exemption as inclusive of commercial property provided that a portion of it is susceptible to use and used as a residence.

I recognize as a matter of binding authority by reason of the *Jacoby* and *O'Brien* decisions that the homestead exemption statute affords an absolute shield against creditors to the debtor who takes occupancy of property he already owns. I am satisfied that such debtor should properly be able to employ non-exempt property to acquire a homestead if accomplished without an inequitable or fraudulent intent simply to preserve a home. However if accomplished in an inequitable and fraudulent manner or with fraudulent intent then the shield of the exemption is not available.

I believe that the Eighth Circuit case of *Kangas v. Robie,* 8th Cir., 264 F. 92 (1920), is an accurate guide to Minnesota law in making that distinction. In that bankruptcy case arising in Minnesota, the bankrupt a merchant departed from his past practice of depositing his receipts in a bank and in making periodic payments to suppliers in the meanwhile selling merchandise previously acquired on credit and using the fund to purchase a home into which he moved and claimed exempt. The Bankruptcy Referee denied exemption finding that the bankrupt:

"set out with the corrupt purpose and design of defrauding his creditors; that he purchased the property which he is claiming as a homestead with money de-

rived from the sale of goods which he had obtained on credit from his creditors, which money was much the larger part of his assets; and that he made the purchase, moved into the property, and is now claiming it as a homestead to accomplish that purpose and design."

The Referee's action having been approved in the District Court appeal was taken to the Court of Appeals where the bankrupt claimed error on the ground that the *Jacoby* case required the allowance of the homestead notwithstanding the fraud. The Court of Appeals refused to extend the *Jacoby* case indicating that *Jacoby* went no further than to announce a general rule that "the right to exemption cannot be denied *solely* because non-exempt property had been used to acquire the property claimed as exempt". The Court recognized that there was no showing in *Jacoby* of any intention or design on his part of defeating his creditors or of any evidence of an improper act to accomplish that end and accordingly the Minnesota Supreme Court had no need to consider the effect of such conduct on the entitlement to exemption. The basis of the denial of exemption is best put in the language of the opinion stating:

"The situation which petitioner presents to us is a confession of *bad faith* on his part, that the purpose with which he took title to the property which he now claims as exempt was to defraud his creditors, and we must decline to give it our approval. We are persuaded that the Supreme Court of Minnesota would also refuse to approve such conduct and make it a basis on which to allow the exemption."

That reading of *Jacoby* is I am satisfied correct and binding on this Court. There is no later pronouncement by way of holding in any Minnesota case since *O'Brien* as previously indicated merely reiterated the holding of *Jacoby.*

Since the mere use of non-exempt assets to acquire exempt assets standing alone is colorless as to motive except indicative of an intention to obtain the benefits of the exemption law the question then arises what further showing will be sufficient to deprive the debtor of exemption rights.

660

## F. EXTRINSIC FACTS AND CIRCUMSTANCES

In a case involving the availability of an exemption law of the state of South Dakota, the Eighth Circuit in *Forsberg v. Security State Bank,* 8th Cir., 15 F.2d 499 (1926), held on a record showing only that the bankrupt had sold certain non-exempt chattels for the ‘purpose of investing the proceeds in exempt chattels, that the bankrupt was entitled to the benefit of the resulting exemption. In commenting on the lack of other and adequate proof the Court suggested the need of a showing of extrinsic facts or circumstances indicative of a fraudulent purpose:

> "We find in the record no evidence that the bankrupt was actuated by any fraudulent purpose, unless such purpose should be implied from his intentional conversion of nonexempt assets into exempt assets. In our opinion no such implication exists. We think that, before the existence of such fraudulent purpose can be properly found, there must appear in evidence *some facts or circumstances which are extrinsic to the mere facts of conversion of nonexempt assets into exempt and which are indicative of such fraudulent purpose.*"

It is the position of the bankrupts here that such fraudulent purpose can be shown only by a demonstration that the non-exempt assets subsequently converted were obtained by means equivalent to theft so the resulting conversion into exempt property would be subject to application of the well recognized doctrine of constructive trust, which has always been a ground for denial of exemption in Minnesota as previously indicated. The bankrupts have further contended that only evidence directly relevant to that question is properly relevant to the consideration of the evidence in this case. The trustee, however, contends that no such fraud upon a fraud is required but that the exemption may be lost by a showing through additional evidence bearing upon fraudulent intent without reference to the source of the non-exempt assets, or if the test be on a stricter basis by a showing of inequitable conduct in dealing with the otherwise non-exempt assets, and argues for a very broad standard of relevance.

The ultimate issue is whether McGlynn and Garmaker viewed in the totality of their relationships and activities did in fact intend to defraud their creditors by their actions in enhancing the value of the homestead which they already had, and in concealing other assets in the enhancement of the policies of insurance available to them at the beginning of 1974.

I conclude that as suggested in *Forsberg* the showing of any fact or circumstance other than the mere conversion which bears on the motive and intent of the bankrupts in the activities leading up to and involving the conversion is relevant to the question, and the issue is simply whether it satisfactorily demonstrates that the bankrupt's intention was not the seeking merely of an exemption but motivated by the fraudulent purpose of removing non-exempt property from the reach of his creditors.

Where the issue is the existence of such fraudulent motive and purpose the proof may be largely circumstantial as well as direct and great liberality must be allowed in the admission and consideration of evidence bearing on the question. 8A *Dunnell Minn.Dig.,* 3 ed., Sec. 3838, and the cases cited. In the present case as reflected in the findings, the Court has permitted evidence with respect to the relationship of the parties and considered the parallel course of conduct of the bankrupts in the disposition of common and individual properties. I am satisfied that there is no substantial evidence in the case which is properly narrowly restrictive of the activities of only one of the bankrupts. See *Matter of Vecchione,* 407 F.Supp. 609, 9 Collier Bankruptcy Cases 537 (S.D.N.Y.1976).

Referring to but without repeating the findings I think it evident that the bankrupts were guilty of inequitable, and I believe fraudulent practices in their dealings with the non-exempt assets which they used to enhance the value of their exempt assets and that taken in connection with other preferential and fraudulent transfers in the

general disposition of their readily available property is sufficient to show that the eventual transfers by which those enhancements were accomplished were done with the fraudulent intent and motive to remove such assets from the grasp of their creditors.

While the matter is not of particular concern in this case where the sequence of events is not substantially subject to dispute on the evidence as offered, I am satisfied that the burden rests on the bankrupts to establish and sustain their right to exemption. That is the plainly mandated requirement of Bankruptcy Rule 403, and the matter being one of procedure the Rule is operative and there is no reason to depart from that mandate.

Since the allowability of exemption is the issue in these cases, it is unnecessary for me to consider whether as a matter of federal law there is some fundamental principle underlying § 6 which in the face of fraudulent activities such as here would deprive the bankrupts of the right under § 6 to resort to the state exemption law, nor any need to attempt a definition of the scope of the proviso found in § 6 to the extent the enhancements here might be considered to be concealments. See and compare *In re Myers,* D.C., W.D. Missouri, 383 F.Supp. 251 at 258 as reflective of statutory purpose.

## G. THE REMEDY

The trustee has pointed to the evidence in this case relating to transfers to third parties as not only indicative of intent but also as demonstrating the possible fraudulent or preferential nature of the transactions themselves, and suggests that in lieu of proceeding against the recipients he should as a substantive matter be entitled to recoup traceable proceeds or values out of the property otherwise claimed exempt.

While I have considered that evidence on the matter of intent and purpose, I am not satisfied that there is any warrant for the substantive type of action which the trustee proposes. To the extent the rights of third parties may be involved those matters should be tried in appropriate actions to which they are parties. While this Court is a court of equity it is restricted to the exercise of a statutory jurisdiction and there being no specific authority advanced for the trustee's theory, it will not be applied. In this, the only effect of the proviso in § 6 is that any recovered items will not be subject to a further claim of exemption.

The trustee contends that by reason of the fraudulent activity of the bankrupts they have entirely forfeited all exemption rights. That possibility is recognized in 1A *Collier on Bankruptcy,* 14th ed., Sec. 6.11 as the necessary result of the exemption statutes in certain jurisdictions, but no such result is mandated by Minnesota law.

Having in mind that this is a court of equity whose overriding concern is to grant relief appropriate to the circumstances, mindful of the great concern evidenced in Minnesota law for the protection of the homestead as a shelter for the family, and the fact that except for the fraudulent enhancements of value of each homestead detailed in the findings, its original acquisition and retention in each instance is otherwise not tainted with fraud, it is not necessary to go so far as to strip the bankrupts of all protection in that regard but merely to assure that the estate is assured of repayment of the fraudulent investments in them.

The insurance policies might be entitled to similar treatment if this Court were permitted to apply the insurance code as an exemption law. That is not permitted in view of the *Charlton* case, and accordingly the trustee with respect to the insurance policies is entitled to them in gross. In that connection one policy of insurance inadvertently omitted in the schedules of Donald McGlynn is by the agreement of counsel expressed in the briefs deemed to be the subject of an amendment of schedule and disposed of consonant with the other policies properly involved in this case.

The general rule in bankruptcy is to value assets as of the date of filing of the petition. As to insurance see 4A *Collier on Bankruptcy,* 14th ed., Section 70.23[3] and cases cited in footnote 27. By reason of the disputes with regard to the insurance policies they have remained in the possession of

the bankrupts or their counsel. Over the intervening period of time their value may have altered by reason of application of reserves against premiums, and in the case of the policy omitted from the McGlynn schedules its then cash value of $672.33 was lost by reason of lapse. These losses in value are properly the responsibility of the bankrupts. Accordingly the trustee is entitled to judgment with respect to the omitted policy where the loss of value is known. Since the diminution in value of the other policies will not be known until they are obtained by the trustee and liquidated the Court will reserve jurisdiction for the entry of an appropriate further monetary judgment against the bankrupts for any demonstrated diminution in value.

## CONCLUSIONS

In addition to the conclusions of law and fact incorporated within the above discussion, I particularly conclude as follows:

1. Donald McGlynn and JoAnn McGlynn, being a volunteer with respect thereto, are not entitled in law to the benefit of homestead exemption as claimed to the extent of $20,587.59 enhancement in value, and the trustee is entitled to judgment in that sum together with interest from and after the date of bankruptcy herein on July 2, 1974 and to have the said judgment adjudged a lien and charge on the fund resulting from its sale by agreement herein.

2. Neither bankrupt Donald J. McGlynn nor JoAnn McGlynn are entitled to exemption with respect to any of the insurance policies listed in their schedules in bankruptcy.

3. The trustee is entitled to judgment against Donald McGlynn in the amount of $672.33 representing the cash surrender value on the petition date of unscheduled National Life Insurance Policy No. 1360851.

4. The trustee is entitled to judgment against each bankrupt with respect to the insurance policies listed in their respective schedules for the total diminution in value when ascertained of each policy from and after the date of filing of each petition in bankruptcy July 2, 1974 as to Donald McGlynn and January 23, 1975 as to JoAnn McGlynn.

5. Richard Garmaker is not entitled to exemption with respect to his interest in the real estate claimed exempt as homestead in his schedules to the extent of $70,764.76, together with interest on that sum from and after July 2, 1974, and the trustee herein is entitled to judgment in that sum and to have the said judgment determined to be a lien and charge on the said real property.

6. Richard Garmaker is not entitled to exemption with respect to any of the policies of life insurance described in his schedules in bankruptcy.

7. The trustee is entitled to judgment against Richard Garmaker for the diminution in value, if such there be, in each of the said policies of life insurance, when the amount of said diminution of value is hereafter ascertained.

8. The trustee should be authorized in his discretion to commence appropriate actions against any and all of the third party recipients of property transfers mentioned in the findings herein, including but not restricted to those to Darlene Garmaker, Donald McGlynn, Jr., Andrew P. McGlynn, and Nancy McGlynn Phelps, and to further maintain the action or actions now pending against Joseph Schuster.

The foregoing shall constitute the Court's findings of fact, and conclusions of law in accordance with Bankruptcy Rule 752, and accordingly:

IT IS ORDERED:

1. The trustee shall have judgment against the defendants Donald J. McGlynn and JoAnn McGlynn in the sum of $20,587.59, together with interest from and after July 2, 1974, the date of filing of Donald McGlynn's petition in bankruptcy, and the said judgment shall be and constitute a lien and charge on Lot 1, Block 2, Westwood Court Addition, Hennepin County, a/k/a 6301 Westwood Court, Edina, Minnesota, and on the proceeds of any sale thereof, and directing said defendants and each of them to forthwith pay the same from and out of such proceeds.

2. That plaintiff herein shall further have judgment against Donald J. McGlynn in the sum of $672.33, without interest.

3. The plaintiff shall have judgment against defendants Donald J. McGlynn and JoAnn McGlynn, that he is the owner of and not subject to any claim of exemption in the following policies of insurance, to wit: Metropolitan Life Insurance Company Policy No. 12 998 504, Equitable Life Insurance Company Policy No. H62 215 806, National Life Insurance Policy No. 1370709, Metropolitan Life Insurance Company Policy No. 14 050 286, National Life Insurance Company Policy No. 1294568, Crown Life Insurance Company Policy No. 1,179,717, and National Life Insurance Policy No. 1352237, and the said defendants as applicable are hereby directed to immediately turn over and surrender the said policies to the plaintiff.

4. The plaintiff shall have judgment against defendant Richard Garmaker in the sum of $70,764.76 together with interest at six percent from and after July 2, 1974, the date of filing of his petition herein, and the same shall be and constitute a lien and charge on the interest of the said bankrupt in Tract L and Tract X Registered Land Survey No. 693 filed with the Register of Titles, Hennepin County, a/k/a 19200 Walden Trail, Wayzata, Minnesota.

5. Plaintiff shall further have judgment against Richard E. Garmaker, free and clear of any claim of exemption in the following life insurance policies: General American Life Insurance Company Policy No. 1485840, National Life Insurance Company Policy No. 1369462, National Life Insurance Company Policy No. 1370305, Great West Life Insurance Company Policy No. 1842899, Great West Life Insurance Company Policy No. 1352299, and the said defendant Richard E. Garmaker is directed to forthwith turn over and surrender said policies to the plaintiff.

6. The trustee shall have judgment against Donald J. McGlynn, Richard E. Garmaker, and JoAnn McGlynn, as applicable, in the amount to be hereafter determined to constitute the reduction in value of each insurance policy above described from and after the filing of the applicable petition to the date of entry of judgment herein with respect thereto, reserving jurisdiction in the Court to fix by a further appropriate proceeding the amount thereof, and to enter appropriate further orders and judgments with respect thereto.

7. Jurisdiction is reserved to the Court to enter such other and further orders and judgments as may be appropriate or necessary to effectuate the purpose and intent hereof, and to enforce the liens and charges provided in paragraph 1 and 4 hereof.

8. Entry of judgment pursuant to this order is hereby stayed for a period of ten days from the date hereof.

/s/ Kenneth G. Owens
Kenneth G. Owens,
Bankruptcy Judge